UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SKY R., a minor, by and through his parent & natural guardian, Angela R., and ANGELA R., individually, | : | Hon. Joseph H. Rodriguez |
| | : | Civil Action No. 14-5730 |
| Plaintiffs, | : | OPINION |
| v. | : | |
| HADDONFIELD FRIENDS SCHOOL, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's motion [Doc. 31] for partial summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of Plaintiffs' claims under the ADA and NJLAD.  Oral argument was heard on the motion on January 14, 2016 and the record of that proceeding is incorporated here.  For the reasons placed on the record that day, and those set forth below, Defendant's motion will be granted.

## Background

At the time this lawsuit was commenced, Plaintiff Sky R. was a ten year old boy diagnosed with attention dysfunction and dyslexia.  (Compl. at ¶¶1, 8.)  He attended Defendant Haddonfield Friends School ("HFS") from September 2012 until February 13, 2014, at which time he was in fourth grade.  (Id. at ¶ 1.)  Plaintiff Angela R. is Sky's mother.  (Id. at ¶ 5.)

1

Plaintiffs allege that HFS discriminated against Sky by failing to allow appropriate, reasonable modifications for his disabilities and by subjecting him to public humiliation and shaming due to his disabilities.  (<u>Id.</u> at ¶ 2.) They further contend that HFS improperly retaliated against Sky and his parents in response to the vigorous advocacy of the parents in attempt to secure appropriate, reasonable modifications to allow Sky access to the education offered by HFS.  (<u>Id.</u> at ¶ 3.)  Plaintiffs assert that HFS expelled Sky for discriminatory reasons and unlawfully terminated his enrollment on February 13, 2014.  (<u>Id.</u> at ¶¶ 4, 82.)

Angela R. initiated this lawsuit on September 15, 2014, individually and on Sky's behalf.  The Complaint states claims for discrimination and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794[1] (Counts I and IV), Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182 ("ADA") (Counts II and V), and New Jersey's Law Against Discrimination, N.J. Stat. Ann. §10:5-1 ("NJLAD") (Counts III and VI).

---

[1] Section 504 prohibits programs that receive federal funds from discriminating against an individual based on disability: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ."  29 U.S.C. § 794(a).

## Motion to Amend

After briefing and argument on HFS's motion to dismiss Plaintiffs' ADA claims, which was denied without prejudice on April 22, 2015 subject to further discovery, [Doc. 15], HFS filed an Answer to the Complaint on May 19, 2015.  HFS asserted no counterclaims against Plaintiffs or third-party complaints in the original Answer.  [Doc. 20.]

On July 9, 2015, HFS filed a motion to amend its Answer to include a Counterclaim against Plaintiff Angela R. and to join Richard Londen as a Third-Party Defendant.  [Doc. 26.]  HFS alleges that Angela and Richard attended a town hall meeting at HFS on June 9, 2015, and distributed a defamatory letter to attendees along with a copy of the Complaint in this matter.  (Def. Br., Ex. A, Counterclaim at ¶¶ 5-6, 12; Ex. B, Third Party Compl. at ¶¶ 5-6, 12.)  According to HFS, the letter contained false statements about HFS, its administration, staff, and Board of Trustees causing HFS to incur damage to its reputation and character, as well as humiliation and embarrassment.  (Def. Br., Ex. A, Counterclaim at ¶¶ 16-17; Ex. B., Third Party Compl. at ¶¶ 16-17.)  Plaintiffs have opposed allowing amendment of the Answer to assert the Counterclaim against Angela and Third Party Complaint against Richard.  The Court decides this issue on the papers pursuant to Fed. R. Civ. P. 78(b).

Defendant argues, relying primarily on Federal Rule of Civil Procedure 15(a), that leave to amend should be liberally granted and none of the circumstances warranting denial of a motion to amend are present here-undue delay, prejudice, bad faith or futility.  Indeed, Defendant argues that this Motion was filed within the Court's deadline to amend the pleadings and one month after the precipitating events.  Thus, its Motion, which seeks to add a defamation counterclaim against Angela and file a third-party complaint against Richard for the same, should be granted.

To the contrary, Plaintiffs argue that Rule 15(d) governs Defendant's Motion because it attempts to supplement its pleading with an after-acquired counterclaim for defamation.  Plaintiffs argue that the defamation claim governed by state law is a permissive counterclaim unrelated to the original complaint and Defendant fails to demonstrate that this Court has jurisdiction over same.  Moreover, Plaintiffs argue that the defamation claim is asserted in bad faith, will increase expenses and delay proceedings on its federal civil rights claims and the claim is futile.  Thus, the Court should exercise its discretion and deny Defendant's Motion.

Federal Rule of Civil Procedure 15 governs amendments to pleadings and provides that leave to amend shall be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). However, here, Defendant seeks to

supplement its pleading.  Thus, Rule 15(d) governs this dispute.  The Rule provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed. R. Civ. P. 15(d).  Courts within the Third Circuit have found that leave to supplement a pleading is within the sound discretion of the court and should be granted "if it will promote the just disposition of the case, will not cause undue prejudice or delay and will not prejudice the rights of any parties."  Medeva Pharma Ltd. v. American Home Products Corp., 201 F.R.D. 103, 104 (D. Del. 2001) (citing The Proctor & Gamble Co. v. McNeil-PPC, Inc., No. 98-361, 1998 WL 1745118 (D. Del Dec. 7, 1998)); see also United States v. Local 560 (I.B.T.), 694 F. Supp. 1158, 1187 (D.N.J. 1998).

Moreover, because Defendant is seeking to include a counterclaim with its proposed amended answer, Rule 13 is also implicated and provides that "[t]he court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading."  Fed. R. Civ. P. 13(e). "Courts have found that 'Rule 13(e) is to be read in conjunction with Rule 15(d), which governs the

filing of supplemental pleadings.'" Board of Trustees of Nat. Elevator Indus. Health Ben. Plan v. McLaughlin, No. 12-4322, 2013 WL 4788190, at *3 (D.N.J. Sept. 6, 2013).

Finally, with regard to the proposed third-party complaint, Rule 14 states, in pertinent part, that a third-party plaintiff must "by motion, obtain the court's leave if it files the third-party complaint more than 10 days after serving its original answer." Fed. R. Civ. P. 14(a)(1). The decision to permit the filing of a third-party complaint is within the discretion of the court. See Spencer v. Cannon Equipment Co., No. 07–2437, 2009 WL 1883929, *2 (D.N.J. June 29, 2009); United States v. SB Building Associates, Limited Partnership, No. 08-5298, 2009 WL 2392098, *1 (D.N.J. August 3, 2009). Courts have considered the following factors in determining whether to permit filing of the third-party complaint: "(1) the timeliness of the motion; (2) the probability of trial delay; (3) the potential for complication of issues at trial; and (4) prejudice to the original plaintiff." Spencer, 2009 WL 1883909 at *2 (citing Ronson v. Talesnick, 33 F. Supp. 2d 347, 356 (D.N.J. 1999)).

As an initial matter, based on the facts before the Court, Defendant's request to amend its Answer to include a counterclaim would not cause undue prejudice or delay. This Motion was filed within the Court's deadline

to amend the pleadings or add new parties, discovery is ongoing, and this Motion was filed within one month of the events giving rise to the proposed counterclaim.  For the same reasons, based on the current posture of this case, Defendant's request to file a third-party complaint is timely and will not cause any appreciable trial delay as the parties are still engaged in pretrial discovery.  Moreover, based on the foregoing and the largely unsupported assertions of increased expense and delay, the Court cannot find that Plaintiff will be unduly prejudiced by the inclusion of this claim.

However, these findings do not end the Court's inquiry because Plaintiffs also raise futility arguments.[5] First, Plaintiffs argue that Defendant's proposed counterclaim and third-party complaint would be futile because the Court lacks jurisdiction over same.  The Court finds, based on review of the proposed pleadings, that the Court would have

---

[5]  The Court may deny leave to amend if the amendment would be futile. Foman v. Davis, 371 U.S. 178, 182 (1962); Stallings v. IBM Corp., No. 08-3121, 2009 WL 2905471, at *15 (D.N.J. Sept. 8, 2009).  In determining whether a proposed amendment would be futile, the Court applies the same standard of legal sufficiency that applies to a motion to dismiss filed under Rule 12(b)(6). Travelers Indemnity Co. v. Dammann & Co., 594 F.3d 238, 243 (3d Cir. 2010). When deciding a 12(b)(6) motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)); Fed. R. Civ. P. 12(b)(6).

jurisdiction over the defamation claim.  Defendant's proposed counterclaim in its Answer and its proposed third-party complaint both allege supplemental jurisdiction based on 28 U.S.C. § 1367(a) which provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367.  Courts will exercise supplemental jurisdiction over claims lacking an independent jurisdictional basis if same are so related to the claims conferring original jurisdiction that they form part of the same case or controversy.  Troncone v. Velahos, No. 10-2961, 2012 WL 3018061, at *7 (D.N.J. July 23, 2012) (citing HB General Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1197 (3d Cir. 1996))  "Courts generally construe § 1367 to indicate that a claim is part of the same case or controversy if they share significant factual elements."  Id.

In this regard, the Third Circuit has held that supplemental jurisdiction is proper if the claims derive from a common nucleus of operative facts and if the claims are such that one would expect that all claims would be tried in a single proceeding.  Lyon v. Whisman, 45 F.3d

758, 760 (3d Cir. 1995); Troncone, 2012 WL 3018061, at *7.  Determining

whether claims derive from a common nucleus of operative fact test is

highly fact-sensitive.  Lyon, 45 F.3d at 760.  As noted by Plaintiffs, the

Third Circuit has addressed the issue of supplemental jurisdiction and the

nucleus of operative fact test in relation to state-based slander/defamation

claims in at least two instances: Nanavati v. Burdette Tomlin Mem'l Hosp.,

857 F.2d 96 (3d Cir. 1988) and PAAC v. Rizzo, 502 F.2d 306, 309 (3d Cir.

1974).  Notably, in Lyon v. Whisman, 45 F.3d 758, 760 (3d Cir. 1995), the

Third Circuit distinguished these two cases while highlighting the fact-

sensitive nature of supplemental jurisdiction determinations.  The Third

Circuit provided:

> In Nanavati, we found that the district court had the power to
> adjudicate a slander claim asserted by an antitrust defendant,
> noting that "a critic al background fact (the enmity between the
> two physicians) is common to all claims." We concluded that
> the alleged slanders naturally would become part of the
> antitrust trial since the slander victim might use the slanderer's
> allegedly wrongful behavior to justify the victim's conduct
> which the other party contended was actionable under the
> antitrust laws. In PAAC, however, we ruled that the district
> court lacked jurisdiction over a state defamation claim in a suit
> brought under the Economic Opportunity Act charging the
> defendant with unlawfully interfering with the agency
> established under that law. In PAAC we recited the operative
> language of Gibbs and found that the state claims were not
> related sufficiently to the federal claim to permit the exercise of
> pendent jurisdiction.

Id. at 760-61 (internal citations omitted).

Here, because the circumstances presented are more similar to those presented in <u>Nanavati</u> than in <u>PAAC</u>, the Court finds that the proposed defamation claim derives from the same nucleus of operative facts, therefore, the Court's exercise of supplemental jurisdiction is proper. While Plaintiffs' claims are federal civil rights claims and Defendant's proposed claim is a state defamation claim, the claims share the same factual underpinnings: the environment at HFS while Sky was a student, the treatment of Sky while a student at HFS and his ultimate expulsion. The letter distributed by Angela and Richard contained statements that flow largely from the allegations in the Complaint, and, additionally, they attached a copy of the Complaint to the letter.  Indeed, in proving the defamation claim, Defendant would need evidence establishing the falsity of the statements by Angela and Richard, statements which are directly related to the factual allegations in this litigation.  Thus, while it is true, as argued by Plaintiffs, that there are additional elements of the defamation claim and, as a result, additional facts necessary to establish, for instance, harm to HFS's reputation, the Third Circuit does not require total congruity between the operative facts, just more than a mere tangential overlap. <u>Nanavati</u>, 857 F.2d at 105.  It is this Court's conclusion that a state claim that is derived entirely and exists solely because of the underlying federal

litigation demonstrates more than a mere tangential overlap and, thus, not only does the defamation claim derive from the same nucleus of operative facts but the claim is such that a party would expect same to be tried in one judicial proceeding.

Next, however, Plaintiffs argue that allowing the proposed amendment would be futile because it fails to state a claim for defamation. A motion for leave to amend will be denied for futility if the proposed amended complaint "would fail to state a claim upon which relief could be granted." Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). Thus, "[i]n assessing 'futility' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." Id. To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Whether [a] statement is susceptible of a defamatory meaning is a question of law for the court." DeAngelis v. Hill, 847 A.2d 1261, 1268 (N.J. 2004) (quoting Ward v. Zelikovsky, 643 A.2d 972, 978 (N.J. 1994). To state a claim for defamation under New Jersey law, a plaintiff must show: "(1) the assertion of a false and defamatory statement concerning another; (2)

the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." DeAngelis, 847 A.2d at 1267-68 (internal citation omitted). A defamatory statement tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Lynch v. New Jersey Educ. Ass'n, 735 A.2d 1129, 1135 (N.J. 1999). To determine whether a statement is defamatory, a court must examine three factors: (1) content, (2) verifiability, and (3) context. DeAngelis, 847 A.2d at 1267-68 (citing Ward, 643 A.2d at 978).

In analyzing the content, courts should "consider the fair and natural meaning that will be given [to the statement] by reasonable persons of ordinary intelligence." DeAngelis, 847 A.2d at 1268 (alteration in original) (quotation marks omitted). Verifiability requires the determination of "whether the statement is one of fact or opinion." Id. at 1269. "A factual statement can be proved or disproved objectively while an opinion statement generally cannot. Id. That is, "[o]pinion statements . . . are generally not capable of proof of truth or falsity because they reflect a person's state of mind. Hence, opinion statements generally have received substantial protection under the law." Ward, 643 A.2d at 979. However, a plaintiff has a cause of action for harm from a defamatory opinion

statement "when the statement implies underlying objective facts that are false." Id. (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-20 (1990)).  Where the statement contains "[l]oose, figurative or hyperbolic language," it is more likely to be non-actionable.  DeAngelis, 847 A.2d at 1269 (quoting Ward, 643 A.2d at 980 (alteration in original)).  With regard to context, courts must consider, in addition to the language used, "[t]he listener's reasonable interpretation . . . [within] the context in which the statement appears[.]"  Id.

As described in HFS's proposed Counterclaim and Third Party Complaint, the alleged factual assertions of concern are: (1) "[t]he letter accuses HFS and its Board of Trustees of abusing a child and/or not taking action to stop the alleged abuse he was receiving," (2) "[t]he letter also accuses HFS of "sabotaging Sky R.'s efforts to gain admittance to another school," "straying from its values and not being Quakerly." (Def.'s Br., Ex. A, Counterclaim at ¶¶ 8-9; Def.'s Br., Ex. B, Third Party Complaint at §§ 8-9.)  HFS asserts that as a result of the complained about actions, it suffered "damage to its reputation and character" and will continue to suffer "humiliation and embarrassment." (Def.'s Br., Ex. A, Counterclaim at ¶¶ 16-17; Def.'s Br., Ex. B, Third Party Complaint at §§ 16-17.)

In fact, the letter in question begins:  "Hello Parents!  We believe you

13

are here tonight because we the parents of Sky R. a former HFS student

sued the school."  It continues:

> We could not sit by and allow what we believe HFS did to our
> child to be forgotten.  We are suing because someone had to
> take a stand and effect change.  Our suit brought to the
> forefront alleged discrimination, mismanagement, substandard
> teachers and parent complaints that have existed for many
> years.  We believe the suit finally forced someone to take action.

Defendant specifically objects to a subsequent line: "We believe that HFS

has strayed from the values that brought you to this school . . . HFS has

been anything but 'Quakerly.'"  Angela and Richard followed that line with

"It is our position that the board has known about Sky and many other

issues over the years but chose to 'not get involved.'"

Next, the letter outlines Sky's alleged learning disabilities, states

"[w]e believed that Sky might need to attend a special school," and explains

that he was expelled from HFS within two weeks of their raising a request

for "minor accommodations" in the interim.  The authors concluded: "We

believe that HFS purposely sabotaged the process [of finding a new

school], making our search more difficult."

The last page of the letter contains a list of eight "suggestions" for

improvement.  Fifth was "Replace the entire board."  It is followed by the

following elaboration:

Most are there in name only and do little to nothing.  Every new
board member must have important responsibilities and be on
committees.  Many larger condo associations require this and
will not accept "name only" board members.  There are two
board members, one a child psychiatrist and the other a Quaker
who knew Sky and what a fine and upstanding boy he is.  We
believe they chose to sit by while he was being abused and then
expelled.  We were told that the board does not know which
children are asked to leave or why.  Do you want a board like
that?  Board members should be an integral part of the school.

The Court finds that these statements constitute opinion and are not

actionable as defamation.  The letter was accompanied by a copy of the

Complaint filed in this matter (which was the subject of the meeting at

HFS) and is replete with sentences that begin, "We believe."  Further,

Defendant has alleged no facts that would lead a factfinder to conclude that

Angela and Richard acted with actual malice.  See Leang v. Jersey City Bd.

Of Educ., 969 A.2d 1097, 1114 (N.J. 2009) (reiterating that "speech relating

to teachers in their role as educators implicates a matter of public concern,

thus calling for the highest level of protection").  Finally, these statements

occurred in the context of a litigant characterizing the opposing party's

case.  "[T]hese statements are examples of absolutely routine,

commonplace public statements made by litigants about their opponents

and their opponents' cases.  Characterizing such statements as actionable

defamation would create serious problems."  Jewett v. IDT Corp., No. 04-

1454, 2007 WL 2688932, *9 (D.N.J. Sept. 11, 2007).

In concluding on this issue, this Court finds instructive dicta from a case in which the Supreme Court of New Jersey found that reputational or pecuniary harm could be presumed absent actual malice in a defamation case brought by a teacher, as such was a matter of public concern.  <u>Rocci v. Ecole Secondaire MacDonald–Cartier</u>, 755 A.2d 583 (N.J. 2000).  There, a teacher brought a defamation action against her school and a school trip chaperone, who also was a teacher, alleging that the chaperone's letter to the teacher's principal, which criticized the teacher's behavior around her students, was defamatory.  <u>Id.</u> at 584.  The Court found "a strong public interest in the behavior of teachers, especially concerning their conduct with and around their students" and noted that the plaintiff acknowledged her role "as a fiduciary charged with the care of her students."  <u>Id.</u> at 587.  The Court wrote:

> In view of that fiduciary role and the public interest, we believe that there must be free discourse, commentary, and criticism regarding a teacher's professionalism and behavior during a school-sponsored event.  That principle, which is at the heart of this case, tips the scale in favor of requiring plaintiff to allege more than mere embarrassment.

<u>Id.</u>  This Court's decision to deny Defendant's motion comports with the <u>Rocci</u> Court's concern that "we must ensure that our jurisprudence does not act to chill complaints about a teacher's behavior in the presence of students or similar matters involving the public interest."  <u>Id.</u>

## Motion for Partial Summary Judgment

In addition, the Court previously denied without prejudice Defendant's motion to dismiss the Complaint or, in the alternative, for summary judgment [Doc. 9], which argued that the Defendant is exempt from the Americans with Disabilities Act and New Jersey Law Against Discrimination invoked by Plaintiff.  Rather, the Court allowed limited discovery to explore whether the exemption based upon control by a religious organization applies.  With that discovery complete, Defendant has filed a motion for partial summary judgment [Doc. 31] based on the religious exemption.  Defendant seeks dismissal of Counts II, III, V, and VI. Plaintiffs oppose the motion.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  See Boyle v. Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of

establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 252.

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter.  Id. at 249.

As a private school with a religious affiliation with the Religious Society of Friends ("Quakers") and under the control of the Haddonfield Monthly Meeting ("HMM"), HFS is excluded from the ADA and NJLAD. The ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public

accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Title III of the ADA contains an exemption for "religious organizations or entities controlled by religious organizations."  42 U.S.C. § 12187.

> The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services.
>
> Religious entities that are controlled by religious organizations are also exempt from the ADA's requirements. Many religious organizations in the United States use lay boards and other secular or corporate mechanisms to operate schools and an array of social services. The use of a lay board or other mechanism does not itself remove the ADA's religious exemption. Thus, a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious organization, even if it has a lay board. The test remains a factual one—whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization.

28 C.F.R. § Pt. 36, App. C.

Similar to the plaintiffs in <u>Doe v. Abington Friends School</u>, 480 F.3d 252, 254 (3d Cir. 2007), Plaintiffs here argue that HFS has strayed from its religious foundation and, therefore, is not eligible for the ADA exemption. Plaintiffs urge the Court to apply the factors set forth by the Third Circuit to determine whether an entity has a purpose and character that is primarily religious so as to be exempt from Title VII's anti-discrimination provisions. They are:

(1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

<u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 226 (3d Cir. 2007).  The Circuit cautioned, "not all factors will be relevant in all cases, and the weight given each factor may vary from case to case."  <u>Id.</u> at 227. Further, "whether an organization is 'religious' for purposes of the [Title VII] exemption cannot be based on its conformity to some preconceived

notion of what a religious organization should do, but must be measured with reference to the particular religion identified by the organization." Id. at 226-27.

The Court finds that HFS is controlled by a religious organization, similar to the example provided in the ADA regulations, "a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious order, even if it has a lay board." 28 C.F.R. § Pt. 36, App. C.

The governing documents of HFS establish HFS as a non-profit entity "[t]o establish and maintain a Friends School in accordance with the principles of the Society of Friends including meetings for worship in the manner of Friends" . . . and [t]o promote the principles, testimonies and concerns of the Religious Society of Friends." (Doc. 31, Def. Br. at Ex. 3, HFS Cert. of Inc.)  The property leased to HFS by HMM is to be occupied "exclusively as an independent Quaker school, as Quaker schools are defined by the Friends Council on Education." (Doc. 31, Def. Br. at Ex. 4, Lease Agmt.)  These documents cede control to HMM, specifically to distribute all assets to HMM upon dissolution of HFS, (Doc. 31, Def. Br. at Ex. 3, HFS Cert. of Inc.), and to terminate the lease agreement with HFS

but retain the name Haddonfield Friends School if HFS is not operated as a Quaker school, (Doc. 31, Def. Br. at Ex. 4, Lease Agmt.).[2]

The Bylaws of HFS state that "the School exists under the spiritual and nurturing care of Haddonfield Monthly Meeting of the Religious Society of Friends, Inc." (Doc. 31, Def. Br. at Ex. 5, Bylaws.)  "The mission of the School is to provide a strong academic program rooted in Quaker values and the belief that there is 'that of God in everyone.'" (Id.)  The Bylaws also mandate that HFS is governed by a Board of Trustees composed of at least 60% members of the Religious Society of Friends.

---

[2]     The circumstance that the New Jersey Association of Independent Schools ("NJAIS") required a change in HFS by-laws to make the HFS board self-perpetuating for HFS to obtain re-accreditation did not deprive HFS of its religious control.  Rather, the change was required to have been approved by HMM.  (Doc. 31, Def. Br. at Ex. 4, Addendum to Lease Agmt.) Further, while HMM was deprived of authority to appoint Meeting members or other Quakers to the HFS board when their numbers fall below minimum requirements specified by the by-laws, (Doc. 31, Def. Br. at Ex. 4, Addendum to Lease Agmt.), the board membership still was required to comply with the By-Laws as far as minimum number of Quakers, (id.). Further, the Amendment to the Lease Agreement between HFS and HMM gave HMM more power to terminate should HFS not comport with HMM's requirements.  (Id.)

HFS also notes, as to the NJAIS visit, that the resulting report concluded that HFS maintained a culture infused with the values and tenets of Quakerism throughout the school day.  (Doc. 37, Def. Reply at Ex. 18, NJAIS Report of HFS Visiting Team, April 17-20, 2011, p. 11 ("Teachers address the Quaker testimonies and the Mission of the school, although with a less structured/academic approach, throughout the school day."); 12 ("Tenets of Quakerism, although not taught in any formal way, are threaded through the Middle School program."); 26-27.)

(Id.)[3]  The Bylaws further provide for a Quaker Life Committee to handle the School's Religious Education curriculum and its implementation in the classroom.  (Id.)  That committee is responsible to arrange for second graders and up to attend "a full half-hour Meeting for Worship on a weekly basis instead of the monthly shortened version."  (Id.)

The Board of Trustees of HFS hires the Head of School and develops the budget for HFS.  The Clerk of the Board of Trustees of HFS, a member of the HMM, testified, as to Quaker decision-making, "decisions are determined by the sense of the meeting, which is a form of consensus, but it's spirit-led.  If any one person disagrees with the decision, then the decision won't be made that day."  (Doc. 31, Def. Br. at Ex. 7, Senopoulus Dep., p. 12.)  This method of collaborative decision-making is practiced by the Board of Trustees.

HFS requires two days per year of professional development for every administrator and every teacher.  (Doc. 31, Def. Br. at Ex. 8, Dreese Dep., p. 30.)  "[T]hat professional development could be in any area.  It could be

---

[3] During the 2012-13 school year, 10 of the 18 board members (55%) were Quaker with 7 of them being from Haddonfield Monthly Meeting ("HMM"). (Doc. 31, Def. Br. at Ex. 6.) During the 2013-14 school year, 6 of the 13 Trustees (46%) were Quaker, with 5 from the HMM.  (Id.)  For the 2014-15 term, 8 of the 15 Trustees (53%) were Quaker, with 6 being from HMM. (Id.)

having to do with Quaker education, Quaker testimonies, it could also . . . be workshops in finance and leadership and admissions.  (Id.)  "Teachers who come in and are not Quaker attend a [two-day] workshop at Pendle Hill called [Educators] New to Quakerism." (Doc. 31, Def. Br. at Ex. 7, Senopoulus Dep., p. 38; accord Ex. 8, Dreese Dep., p. 30.)  The Head of School, along with other "Heads," attends a three-day gathering run by the Friends Council on Education twice per year.  (Doc. 31, Def. Br. at Ex. 8, Dreese Dep., p. 16-17.)  She also regularly has attended workshops and seminars run by the Friends Council on Education, part of the Religious Society of Friends, at Friends Center.  (Id., p. 17-18.)

Again, the school has weekly forty-five minute Meetings for Worship, always attended by the Head of School.  (Doc. 31, Def. Br. at Ex. 8, Dreese Dep., p. 60, 149.)  When questioned whether these are merely forty-five minutes of silence, the Head of School testified, "The way we do it is one of the middle school kids presents a query.  A query could be how do you build your community in your classroom or in your school, and it gives kids something to reflect on, and if they are moved to speak, they can speak to that.  Usually they speak to the query.  Other kids will just talk about something that's personal to them. . . .  There's no set program, but there certainly is protocol."  (Id., p. 73-74.)

The Head of School also makes a State of School presentation annually at the Haddonfield Monthly Meeting, where students have performed.  (Id., p. 61.)  Further, students have silence before their meals to allow for reflection.  (Id., p. 62.)  The Head of School has characterized HFS as a faith-based school: "Quakerism is a spiritual underpinning of the school and all that is included in that, all that is woven in that.  It's a faith that there is that of God in every person, and on that basis, kids are taught to respect, to listen, to embrace diversity." (Id., p. 67.)

> The Quaker Testimonies are simplicity, peace, integrity, which is telling the truth, community, which is shown in their service projects, equality, which I think is very clear with the diversity we have at the school, and stewardship, which is stewardship of the earth, and I think which is very clear in the environmental projects that the school does.

(Doc. 31, Def. Br. at Ex. 7, Senopoulus Dep., p. 44.)

 As explained by the Clerk of the Board of Trustees of HFS, a member of the HMM, "Quaker education is a method of teaching.  We're not trying to create Quakers.  Quakerism was founded on the acceptance of all religions."  (Doc. 31, Def. Br. at Ex. 7, Senopoulus Dep., p. 44.)  The Head of School testified, "[The students] are taught Quaker principles and expected to abide by those Quaker principles at the school."  And those principles are simplicity, peace, integrity, community, equality, and stewardship. (Doc. 31, Def. Br. at Ex. 8, Dreese Dep., p. 64.)  Further, HFS "teaches them about

Quakerism. . . .  Quakers are pacifistic, so they teach kids in that context . . .

skills for conflict resolution, peacefully, . . . . you know, that's imbedded in

every academic discussion that they have, whether it's within the context of

social studies or any other areas of humanities, literature.  (Id.)

Again, the Head of School testified to her belief, "absolutely," that

HFS is a "religious" school and part of the Religious Society of Friends,

(Doc. 31, Def. Br. at Ex. 8, Dreese Dep., p. 62-64):

> I've been working with Friends schools for 25 years, and in
> every aspect, those testimonies are integrated into every aspect
> of the curriculum.  It is a Friends school in every – every
> constituency from our membership at Friends Council [on
> Education⁴] and the workshops and the professional
> development, we have opportunities to embrace, from the
> board of directors, Meeting members, our relationship with
> Meeting members and our Quaker life is a huge piece of that
> school, our outreach – student outreach, community outreach,
> social action. . . .  Those Quaker testimonies are embedded in
> every aspect of school life including the academics. . . .  Quaker
> schools, Friends schools are religious schools.

(Id., p. 62-63.)  In addition, even before a written Quaker curriculum was

implemented at HFS, Quaker beliefs

> were identified when they appeared within academia, whatever
> they were studying.  For example, if middle school kids were
> studying World War II, that was always meshed with questions
> like how would you reconcile Quaker testimony of peace with
> what was going on in the world.  An there would be a question

---

⁴ The Friends Council on Education restricts its members to schools that are
comprised only of religious schools based on the faith and practice of the
Religious Society of Friends.  (Doc. 31, Def. Br. at Ex. 12.)

for discussion or debate, questions around building community, how do you create a community within your classroom, how do you create that in the school, where does it start, does it start with your family. . . . And everything that the kids write, study, read reflects Quaker testimonies and they are extracted and discussed and focused on.

(Id., p. 150.)

Moreover, the Chair of Haddonfield Monthly Meeting testified that HMM takes steps to ensure that HFS includes Quakerism in its curriculum. (Doc. 31, Def. Br. at Ex. 14, Owens Dep., p. 10.)

The status and health of the school is of interest to everyone in the Meeting. To those of us who are particularly dealing with the worshipfulness of the community, the school has particular concern. . . . We have annual reports on the school. We have members, I'm one, who are adopted by the school, and we attend worship with the children. Our members who are on the school board also let us know how things are going. We ask them. . . . [T]he Head of School comes and speaks to us, as a community. . . . She lets us know what kind of Quaker education is going on, she lets us know how the Testimonies are being taught.

(Id.)

The Court is satisfied under these circumstances that HFS is a religious organization or controlled by a religious organization. See also Marshall v. Sisters of the Holy Family of Nazareth, 399 F. Supp. 2d 597, 605-07 (E.D. Pa. 2005); Woods v. Wills, 400 F. Supp. 2d 1145, 1159-62 (E.D. Mo. 2005); White v. Denver Seminary, 157 F. Supp. 2d 1171, 1173-74 (D. Colo. 2001). Counts II and V will therefore be dismissed.

The Court has carefully considered Plaintiffs' arguments but finds that they either simply disagree with the record evidence produced during discovery or take issue with whether the Quaker teachings are, basically, religious enough.  For example, Plaintiffs do not agree that a moment of silence, by itself, could be construed as keeping with a "religion."  See Tr. of Jan. 14, 2016 Oral Arg. at p. 36.  Yet both the United States Supreme Court and the Third Circuit Court of Appeals have found that a moment of silence in school has religious connotations.  See Wallace v. Jaffree, 472 U.S. 38, 56 (1985) (holding that Alabama's moment of silence statute lacked any secular purpose and therefore was unconstitutional); May v. Cooperman, 780 F.2d 240, 242 (3d Cir. 1985) (New Jersey moment of silence law likewise violated the Establishment Clause).  It is not the Court's role in this matter to question the beliefs or practices of any religion.  While the Court appreciates Plaintiffs' position, it is not persuaded to deny HFS the religious exemption provided for by the ADA.

Finally, the NJLAD also exempts organizations that are Operated or maintained by a bona fide religious or sectarian institution.  N.J. Stat. Ann. § 10:5-5(l).  See also Romeo v. Seton Hall Univ., 875 A.2d 1043 (N.J. Super. Ct. App. Div. 2005).  As such, Counts III and VI will be dismissed.

Counts I and IV survive this Motion.

An Order will be entered.


Dated:  March 31, 2016                          /s/ Joseph H. Rodriguez
                                                JOSEPH H. RODRIGUEZ
                                                      U.S.D.J.